RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
LARONDA MARTIN
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
LaRonda_Martin@fd.org

Attorney for Daniel Avery

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>            Plaintiff,<br><br>    v.<br><br>**DANIEL AVERY,**<br><br>            **Defendant**. | Case No. 1:24-CR-00079-CRC<br><br>**SENTENCING POSITION PAPER** |

COMES NOW, Defendant Daniel Avery, by and through his appointed counsel, LaRonda Renee Martin, Assistant Federal Public Defender, pursuant to Federal Rule of Criminal Procedure 32, and USSG § 6A1.2(b), and submits the following Position Paper with respect to sentencing in this case.

**I.      Benefit of Plea Agreement**

Daniel Avery should receive the benefit of the plea agreement. Public policy favors following plea agreements because they play a central role in the criminal justice system with roughly ninety-five percent (95%) of cases resolving in guilty pleas.[1] This plea agreement was

---

[1] *Class v. U.S.* 138 S.Ct. 798, 807 (2018).

the result of extensive negotiations by the parties after each weighed the strengths and weaknesses of their case and considered the factors under 18 U.S.C. § 3553(a). As such, this Court should allow Mr. Avery the benefit of his bargain by accepting the terms of the plea agreement.

## II. Defense Counsel Certification

Undersigned counsel and Mr. Avery have reviewed the Presentence Investigation Report (PSR). Counsel has communicated the following position to the probation officer and Assistant United States Attorney in the form of a copy of this document.

## III. The Sentencing Hearing

It is estimated that the sentencing hearing will take no more than one hour.

## IV. Sentencing Factors in Dispute

### A. Factual Correction

Daniel Avery objected to the statement in Paragraph 35 of the Presentence Report. He requests that the record be corrected to reflect that he did not physically assault his wife. A complaint was never filed and thus, never convicted of an assault against his wife. The charges were dismissed.

### B. Legal Objections

There are no legal objections.

## V. Position as to Sentencing and Recommendations

With regard to his sentence, Mr. Avery respectfully requests that this Court sentence him to probation.

1.   **History and Characteristics of Daniel Avery**

A.   **Daniel Avery and his family proudly served this Nation.**

Daniel Avery was born to the parents of Glen and Maya Avery.[2] He was raised in the small town of Blythe in southern California.[3] His father was the owner operator of a small business and his mother worked as a bookkeeper for Palo Verde Valley Unified School District.[4] He graduated from Palo Verde High School in 1996.[5]

After graduating high school, Mr. Avery followed in the footsteps of the male role models present during his formative years by joining the United States Armed Forces. Multiple family members proudly contributed to the safety and security of this Nation through their collective military service. His grandfather, Clive Avery, bravely served in the U.S. Air Force. He flew B-24 and B-29 long-range heavy bombers during World War II. His father, Glen Avery, and cousins, Paul and Ann Marie Avery, also dedicated a portion of their lives as Airmen. Rick Avery, an uncle, and former U.S. Marine completed three tours in Vietnam. Doug Avery, Rick's brother, committed a portion of his life to safeguarding our country's security as a Coastie for the U.S. Coast Guard. The only U.S. Army service member in his family is his cousin, Richard Avery. With this many dedicated family members of the Armed Forces, Daniel Avery was proud to follow in their paths as a service member.

---

[2] Exhibit 1, Daniel Avery, Life Story.
[3] *Id.*
[4] *Id.*
[5] *Id.*

3

Daniel Avery enlisted in the United States Air Force in August 1996.[6] He was trained at Sheppard Air Force Base in Wichita Falls, Texas. For his first tour of duty, Mr. Avery was assigned to Travis Air Force Base in Fairfield, California.[7] His Air Force Specialty Code (ASSC) was 4N1X1 ( surgical technician). On a normal day, he worked in an operating room. He helped create sterile environments with instrumentation and supplies required for the day's surgery.

In 1993, President Clinton unveiled his first military spending plan that sent Congress a $263.4 billion defense budget for fiscal year 1994 that would reduce troop strength to a level not seen since the Korean War.[8] It significantly cut military personnel. The impact of the President Clinton's military plan: Total National Defense Spending 1994: $264.4 billion 1998: $253.9 billion.[9]

Daniel Avery's separation stemmed from the plan to reduce military personnel. In 1998, he was honorably discharged from the U.S. Air Force.[10] In that same year, he was hired by Bethesda Hospital in Boynton Beach, Florida to work as a surgical technician.[11] In 1999, Mr. Avery obtained employment with Desert Samaritan Medical Center in Mesa, Arizona also

---

[6] Exhibit 1, Daniel Avery, Life Story.

[7] *Id.*

[8] Healy, Melissa. *"Clinton Defense Budget Cuts into Troops, Ships."* The Los Angeles Times, March 1993. Https://www.latimes.com/archives/la-spm-1993-03-27.html.

[9] *Id.*

[10] Exhibit 2, Certification of Military Service.

[11] Exhibit 1, Daniel Avery, Life Story.

as a surgical technician.[12] He maintained said status until his acceptance into the Doctor of Pharmacy program at Midwestern University in Glendale, Arizona in 2005.[13]

### B.   Daniel Avery is a loyal husband and loving father.

In 1998, Mr. Avery met his wife, Jamiee, during a brief visit to their hometown. While waiting to enter a movie theatre, he saw an extremely beautiful young woman. He knew that he had to meet her. He walked over to Jamiee, introduced himself, and after conversing for some time, they exchanged numbers. Jamiee and Daniel dated for three years before marrying. In 2001, they exchanged wedding nuptials in a small white wedding chapel in Las Vegas, Nevada.

Their union produced four children. Mr. Avery has been a loving father to his children and loyal husband to his wife, Jamiee. He has always been active in the lives of his children. Bryce played hockey and Riley was a competitive gymnast. Daniel regularly transported Bryce to his practices, attended most of his games, and traveled across the country for Bryce's sporting competitions. Daniel and his wife also transported and attended their daughter's local practices and tournaments. Daniel actively helped both children with their homework. He was especially helpful with their mathematics and chemistry assignments.

The Averys are also avid hikers. They've hiked to the Tonto National Forest in Payson, Arizona. They've hiked in and around the Grand Canyon. When the air cooled and fall colors emerged, Daniel and his family shared every hiking trail in Sedona, Arizona. The Averys also spent quality time on the Colorado River where he taught his children to launch, drive, and

---

[12] Exhibit 1, Daniel Avery, Life Story.

[13] *Id.*

recover boats. To help this river maintain a sustainable ecosystem, Daniel and his family often volunteered to collect the trash lining the riverbank.

The Avery family is very close. Daniel Avery would be greatly missed by his four children, wife, family, and community were he incarcerated on the instant offense.

### 2.   *The Need to Afford Adequate Deterrence to Criminal Conduct*

This section addresses the question of whether a prison sentence will accomplish the § 3553 factor of deterrence. Such an examination requires an analysis of both general and specific deterrence.

### A.   *General Deterrence*

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime. This faulty conception has resulted in the mass incarceration of individuals in the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at* https://www.brennancenter. org/publication/what-caused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes:

> There is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

*Id*. at 1031. The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963) ("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

### B.   Specific Deterrence

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016). To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen

et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

The 2016 study conducted by the National Institute of Corrections (NIC) establishes three critical tenets regarding incarceration and specific deterrence. Incarceration has a negligible impact on crime prevention. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016); *see also* Vera Instit. of Justice, *Overview of The Prison Paradox: More Incarceration Will Not Make Us Safer* (July 2017) (concluding that research shows a "weak relationship between incarceration and crime reduction and highlights proven strategies for improving public safety that are more effective and less expensive than incarceration"). Instead, longer prison sentences may lead to greater risks of recidivism. *See id*. There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties, and exposing less serious offenders to older more serious offenders - leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).

Moreover, harsh penalties do not improve the long-term outcomes of the offender. Longstanding research has found that imprisonment brings about negative individual-level changes that can harm re-integration upon release. National Research Council. *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* (Nat'l Acad. Press 2014), available at. https://doi.org/10.17226/1861; *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887).("All in all, punishment hardens and renders people more

insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

### 3. The Need to Avoid Unwarranted Sentencing Disparities

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct.[14] The court should avoid unwarranted differences in sentencing among defendants whose conduct and characteristics are similar.[15]

This Court has sentenced a multitude of defendants charged with unlawful entry upon the Capitol on January 6, 2020. A routinely updated table provides additional information about the sentences imposed on other Capitol breach defendants by this Court.[16] Assistant United States Attorney, Jack Burkhead, in his Sentencing Memorandum, cited to several cases in support of his position for incarceration. However, the cases referenced by Mr. Burkhead were not cases sentenced by this Court.

### A. Review of Imposed Sentences by This Court

Mr. Avery provides a review of several sentences imposed by this Court that better demonstrate why a recommendation for incarceration is unreasonable and unwarranted.

Daniel Avery, like many others to be discussed below, attended the "Stop the Steal" rally on January 6, 2020.[17] At approximately 2:44 p.m., he entered the United States Capitol through the Upper West Terrace Door and remained inside for approximately eighteen (18)

---

[14] 18 U.S.C. § 3553(a)(6).

[15] *United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

[16] Https://www.justice.gov/usao-dc/capitol-breach-cases.

[17] ECF No. 29, Page 3.

minutes.[18] While inside, Mr. Avery paraded through the Rotunda, the East Front Corridor, and the Brumidi Corridor.[19] Prior to exiting, he engaged with a law enforcement officer who moved him away from the North Door.[20] He exited at approximately 3:02 p.m.[21]

Mr. Avery's conduct can be distinguished from some defendants convicted and sentenced by this Court for unlawful entry into the Capitol building. He requests the Court consider the below cases in determining a reasonable and fair sentence:

> a. Andrew Galloway breached the Capitol through a broken window and pumped his fists. While inside he joined a large mob that confronted a line of Capitol Police officers attempting to keep rioters from crossing to the other side. Galloway smoked an unknown substance while in the Crypt surrounded by the mob. He gave encouragement to other rioters. He spent approximately ten minutes inside of the capitol. After participating in the riot, he was captured on a publicly available video yelling, "These are our streets; Yeah that was us today, no that wasn't no Antifa; Fuck the government, this is our Country." During his FBI interview, he insisted that the actions of him and others were beautiful and falsely stated that any agitators were members of the group Antifa. He also followed communications of the Proud Boys – a nationalist organization with a well-documented history of participating in violent acts. [22]

> b. Gracyn Courtright entered the Capitol building approximately twenty (20) seconds after the Parliamentarian door was breached and shortly after the first few people who entered had engaged in a brief struggle with law enforcement. As she stood near the doorway, people around her were using signs to try and break into locked doors. She was undeterred by the destruction of property occurring around her and proceeded further into the Capitol. She posted a video, "Nobody fighting or destroying anything, some of my cnn & fox News watchers need to think for themselves" and another video with the caption "the police officers walked around us, nobody is being violent." Ms. Courtright,

---

[18] ECF No. 29, Page 4

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *United States v. Andrew Galloway*, 1:22-CR-00012-CRC, Government's Sentencing Memorandum, Document 31, Pages 3 – 7. The government requested thirty (30) days incarceration. The Court sentenced Mr. Galloway to thirty (30) days incarceration.

after entering and taking videos in the hallway, proceeded to pick up the "Members Only" sign and walk upstairs near the Senate Chambers. She stepped inside the Senate Chambers where she remained for one minute. After leaving the Senate floor, she started to walk back downstairs. A law enforcement officer approached her and requested that she give him the sign. Courtright returned the sign and left the building. Her social media posts falsely reported that the attack was peaceful and nonviolent. Ms. Courtright spent twenty-four (24) minutes inside the Capitol.[23]

c.      Jacob Lewis made his way to the U.S. Capitol and entered the building through the Senate Wing Doors at 2:55 p.m. He then walked past the House Wing Doors, though the Hall of Columns, through the Crypt, and then exited the building out of the South Door at approximately 3:03 p.m. When interviewed by the FBI, he initially stated that he was "escorted" by the police into the building. He then said that the protestors pushed their way into the Capitol Building shortly after he arrived.[24]

d.      Julie Sizer traveled with her husband to Washington, D.C. to attend the "Stop the Steal" rally. They listened to the former President's speech. They followed the crowd to the Washington Monument. They saw the rioters scaling the walls of the Capitol building and she told her husband that she wanted to go inside the building. Ms. Sizer made her way to the Upper West Terrace. She snapped selfies with her husband. She entered the Capitol building through the Parliamentarian Door at 2:48 p.m. A loud, high-pitched continuous beeping can be heard as Sizer approaches and passes through the door. At approximately 2:50 p.m., she exits the Capitol building. When initially contacted by the FBI, she falsely stated that she did not enter the Capitol building. She later admitted to entering the Capitol on January 6. When asked why she lied to the FBI, she stated that she panicked. She stated that she did not realize how serious the events at the Capitol were until watching the news later.[25]

e.      Edward Nicolas-Alvear Gonzalez was on the Capitol grounds at or around 2:30 p.m. He climbed from the West Front of the Capitol to the Upper

---

[23] *United States v. Gracyn Courtright*, 1:21-CR-00072-CRC, Government's Sentencing Memorandum, Document 26, Pages 3 – 11. The government requested six (6) months incarceration. This Court sentenced Ms. Courtright to thirty (30) days incarceration.

[24] *United States v. Jacob Lewis*, 1:21-CR-00100-CRC, Government's Sentencing Memorandum, Document 36, Pages 2 – 10. The government requested sixty (60) days home detention. This Court sentenced Mr. Lewis to twenty-four (24) months probation.

[25] *United States v. Julia Sizer*, 1:21-CR-00621-CRC, Government's Sentencing Memorandum, Document 26, Pages 2 – 6. The government requested sixty (60) days home detention. This Court sentenced Ms. Sizer to twelve (12) months probation.

West Terrace while yelling "We're charging the Capitol!" He entered the building and walked up the stairs from the West entrance past multiple law enforcement officers attempting to stop his fellow rioters. He recorded himself and others in photographs and videos. He exited the Rotunda and entered Statuary Hall. While there, Mr. Gonzalez smoked a pipe filled marijuana and a marijuana joint. He also distributed marijuana to other individuals unlawfully inside the Capitol building. When another person asked why he was smoking weed in the Capital, Gonzalez replied, "freedom." A United States Capitol Police officer was forced to grab Gonzalez's backpack to force him to exit the capitol. Mr. Gonzalez exited the Capitol building at 3:07 p.m. Mr. Gonzalez livestreamed some of his actions. More specifically, he told his followers, "we're taking our country back" and that the mob advised the officers, "they were doing the right thing" by standing down, because they were significantly outnumbered.[26]

f.      John Clarence Wilkerson, IV, arrived in Washington, D.C. on January 6. At approximately 12:53 p.m., members of the crowd pushed the barricades to the ground, injuring at least one USCP officer. The crowd, Wilkerson among them, walked over the fallen barricades and proceeded up the Pennsylvania Avenue Walkway towards the Capitol. Wilkerson saw other rioters attacking police with pepper spray and weapons. After breaking the line, Wilkerson climbed with other rioters up the steps of the West side of the Capitol, through scaffolding and through the canvas wrapping of scaffolding. At approximately 2:21 p.m., Wilkerson stepped over the broken glass and entered the Capitol Building through the Senate Wing door. He was in the Capitol building for approximately fourteen (14) minutes. On January 10, 2021, Wilkerson sent a message on Facebook to another Facebook user stating in substance that the riot was peaceful until the Capitol Police started using violence.[27]

---

[26] *United States v. Eduardo Nicolas Alvear Gonzalez*, 1:21-CR-00115-CRC, Government's Sentencing Memorandum, Document 41, Pages 3 – 7. The government requested three (3) months incarceration. This Court sentenced Mr. Gonzalez to twenty-four (24) months probation.

[27] *United States v. John Clarence Wilkerson, IV*, 1:21-CR-00302-CRC, Government's Sentencing Memorandum, Document 23, Pages 2 – 8. The government requested sixty (60) days home detention. This Court sentenced Mr. Wilkerson to thirty-six (36) months probation.

Unlike several of the defendants above, Mr. Avery did not smoke illegal or unknown substances while on Capitol property, attempt to steal federal property, falsely accuse the police of engaging in violence, assist with fighting against the physical movement of the Capital police during the execution of their duties, falsely report January 6 events, nor follow communications of organizations engaged in violent acts throughout the United States of America.

Similar to others above, Mr. Avery accepted responsibility for entering and parading throughout the Capitol building and for taking pictures. He, like Ms. Sizer, was not truthful when first asked whether he entered the Capitol on January 6. He did respond with a "no." Mr. Avery did, however, inform the FBI agents that he would prefer to answer those type of questions with the assistance of an attorney.

Mr. Avery, like Ms. Sizer, Mr. Gonzalez, and Mr. Wilkerson, was only in the Capitol building for a short period of time. Mr. Avery was only in the Capitol building for eighteen (18) minutes.[28] Mr. Avery's conduct, similar to these defendants, does not warrant incarceration.

### B. Demonstrations of Remorse

The government, in a majority of the above referenced sentencing memorandum, argued that the defendants never expressed remorse for their involvement on January 6. Undersigned counsel cannot opine on whether the above defendants ever expressed remorse. However, Daniel Avery has expressed remorse on multiple occasions to those whom it matters most – his family.

---

[28] ECF No. 29, Page 4.

Undersigned counsel, at the onset of every case, requests each client prepare and submit, to counsel, their life story. Mr. Avery submitted his life account on July 28, 2024. In his narrative, he expressed remorse for his involvement in this case. Mr. Avery declared:

> "One of the most prolific errors in judgement I have had is my failure to recognize the significance of being in the capitol building on the sixth of January. I failed to realize the impact on my wife, my family, and my friends. I regret my actions on that day because it brings dishonor to my family, and because it caused further division within our country. Nearly every member of my family has served in the armed forces for the United States of America, and many of them were profoundly disappointed in my actions, and for that I am truly sorry. I had no business being anywhere in, or near the capital on that day. I should not have been there. I should not have gone inside, and I most definitely should not have led my wife into that environment.[29]

On August 15, 2024, Bryce Avery submitted a character letter on his father's behalf. He advised that his dad is a thoughtful and loving father, husband, and neighbor.[30] He is a big contributor to his family.[31] He works hard for his family and consistently puts his family first.[32] His father has often spoken of how remorseful he is of his actions, and how his father feels that he has failed his family.[33] Despite the offense, he continues to hold his father in the highest regard.[34]

Daniel Avery recognizes that he will carry a badge of shame with his family, his community, and his country for the remainder his life. While he committed his crimes based upon misguided patriotic beliefs, he now comprehends that what he did is the antithesis of

---

[29] Exhibit 1, Life Story, Daniel Avery.

[30] Exhibit 3, Character Letter, Bryce Avery.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

patriotism. Daniel Avery is painfully aware that his actions constitute a failure as a parent, husband, son, and citizen. Mr. Avery is remorseful for his actions at the Capitol on January 6, 2020.

**VI.     Conclusion**

Daniel Avery had peripheral involvement in the offense. He has significant positives in his character and background as is evidenced by his history and characteristics. Mr. Avery has behaved exceedingly well while under pretrial services supervision. This conviction will result in the lifetime stain of a federal conviction. His crime was conduct that was a single criminal occurrence that was committed without significant planning, was of limited duration, and represented a marked deviation by Mr. Avery from an otherwise law abiding life.

The likelihood that Daniel Avery will *ever* run afoul of the law again is slim to none. He is simply a husband and father trying to provide for his wife and children. His desire to care for others, also remains. Mr. Avery is a gentleman with the best of intentions who made a serious error in judgment, and we respectfully request the opportunity for Mr. Avery to atone for his mistake without a sentence of imprisonment.

**WHEREFORE**, when viewed in light of his personal history; (2) absence of prior criminal history; (3) low risk of re-offending; and (4) strong support of family, a probation sentence is warranted and would adequately reflect the seriousness of the offense, affords

adequate deterrence, promotes respect for the law, provides just punishment for the offense, and protects the public. *See* 18 U.S.C. § 3553(a) and (a)(2).

DATED this 1st day of November, 2024.

RESPECTFULLY SUBMITTED,

RENE L. VALLADARES
Federal Public Defender

By: */s/ LaRonda Martin*
LARONDA MARTIN
Assistant Federal Public Defender
Attorney for Daniel Avery

## CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that she is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on November 1, 2024, he served an electronic copy of the above and foregoing **SENTENCING POSITION PAPER** by electronic service (ECF) to the person named below:

>MATTHEW M. GRAVES
>United States Attorney
>JACK E. BURKHEAD
>Assistant United States Attorney
>555 4th Street, NW
>Washington, DC 20001

>*/s/ Jeremy Kip*
>Employee of the Federal Public Defender